OAO CORPORATION, Plaintiff,

v.

The **UNITED STATES,** Defendant

and

**Computer Services Corporation, Defendant–Intervenor.**

No. 01–245 C.

United States Court of Federal Claims.

May 8, 2001 [1].

---

**1.** This opinion in unredacted form was filed under seal on April 27, 2001. The parties prepared an agreed-upon redacted version and provided a copy to the court *in camera.* The court followed the parties' prepared redactions in preparing this opinion for publication. Omissions of material contained in the court's April 27, 2001 sealed opinion are indicated by brackets [ ].

Kevin M. Hodges, Washington, DC, for plaintiff. Paul C. Rauser and Bonnie D. Nathan, Washington, DC, of counsel.

J. Reid Prouty, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Harold D. Lester, Jr., Assistant Director, Department of Justice, Washington, DC, for defendant.

David S. Cohen, Washington, DC, for defendant-intervenor. John J. O'Brien, Washington, DC, and Helaine G. Elderkin, Falls Church, VA, of counsel.

*OPINION AND ORDER*

HEWITT, Judge.

This post-award bid protest action comes before the court on Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction. Plaintiff, OAO Corporation (OAO), protests the decision of the Environmental Protection Agency (EPA) to award the Facilities and Administrative Information Resources (FAIR) Management Contract (FAIR II Contract) to intervenor, Computer Sciences Corporation (CSC). Complaint (Compl.) ¶ 1. For the following reasons, the court DENIES plaintiff's motion.

I. Background

OAO is the incumbent contractor on defendant's FAIR Contract, providing information services technology to the EPA. Compl. ¶ 3. Defendant issued Solicitation No. PR–HQ–00–10323 (Solicitation) on June 29, 2000, seeking offers to supply information technology services to its Office of Research and Development facilities and other EPA offices around the country. *Id.* ¶ 5. The Solicitation specified that "[t]he Government will make award to the responsible offeror(s) whose offer conforms to the solicitation and is most advantageous to the Government cost or other factors considered. For this solicitation, all evaluation factors other than cost or price when combined are significantly more important than cost or price." Defendant's Partial Administrative Record (AR) at 157. The Solicitation also provided that the EPA would conduct a technical evaluation of bid proposals on a 100 point scale, distributed as follows:

| | | |
|---|---|---|
| 1. | Past Performance | 20 points |
| 2. | Written Technical Proposal | 40 points |
| 3. | Use of Small Disadvantaged Businesses | 5 points |
| 4. | Key Personnel/Oral Presentations | 25 points |
| 5. | Start–Up Plan | 10 points |

*Id.* at 158.

OAO submitted a bid with a proposed cost of [ ] and received a technical score of [ ], distributed as follows:

| | | |
|---|---|---|
| 1. | Past Performance | [ ] points |
| 2. | Written Technical Proposal | [ ] points |
| 3. | Use of Small Disadvantaged Businesses | [ ] points |
| 4. | Key Personnel/Oral Presentations | [ ] points |
| 5. | Start–Up Plan | [ ] points |

AR at 427. CSC proposed a cost of $204,950,389 million [ ] and received a technical score of 76.7 points [ ] as follows:

| | | |
|---|---|---|
| 1. | Past Performance | 16.73 points |
| 2. | Written Technical Proposal | 32 points |
| 3. | Use of Small Disadvantaged Businesses | 3 points |
| 4. | Key Personnel/Oral Presentations | 17 points |
| 5. | Start–Up Plan | 8 points |

*Id.* The EPA awarded the FAIR II Contract to CSC. Compl. ¶ 18.

According to plaintiff, this award was improper because 1) CSC misrepresented the availability of key personnel in its proposal;

2) defendant did not engage in meaningful discussions with OAO; 3) defendant did not properly evaluate the competing proposals; and 4) defendant did not award the contract to the best value proposal, as required by the Solicitation. Compl. ¶ 1. Plaintiff seeks a temporary restraining order (TRO) or preliminary injunction to allow it, as the incumbent contractor, to continue performance of its FAIR contract while this protest is pending. Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (TRO Mot.) at 19.

## II. Discussion

### A. Standard of Review

■ To obtain a TRO or preliminary injunction, plaintiff must show:

1. a specific, irreparable injury if the court does not enjoin contract performance;

2. a substantial likelihood of success on the merits;

3. the harm to plaintiff outweighs the harm to defendant; and

4. that granting preliminary relief is in the public interest.

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure (Wright & Miller) § 2948 (1995); *W & D Ships Deck Works, Inc. v. United States*, 39 Fed.Cl. 638, 647 (1997) ("When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction"). A TRO or preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2948. Courts reviewing the award of government contracts under the so-called *Scanwell* jurisdiction, *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), advised a stringent application of judicial restraint in the grant of injunctive relief, particularly with respect to the courts's determination of plaintiff's likelihood of success on the merits. *Princeton Combustion Research Laboratories, Inc.*

*v. McCarthy*, 674 F.2d 1016, 1019 (3d Cir. 1982); *Saco Defense Sys. Div., Maremont Corp. v. Weinberger*, 606 F.Supp. 446, 450 (D.Me.1985). This advice seems particularly apt where, as here, the agency action will be accorded the deference of review under the standards set forth in the Administrative Procedure Act.

### B. Irreparable Injury

■ To demonstrate an irreparable injury, a plaintiff must show that without a preliminary injunction or TRO it will suffer irreparable harm before a decision can be rendered on the merits. Preliminary relief is generally not available if money damages would provide an adequate remedy. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2948.1; *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir.1994); *Nuclear–Chicago Corp. v. Nuclear Data, Inc.*, 465 F.2d 428, 430 (7th Cir.1972). Only in extraordinary circumstances, such as the prospect of insolvency or an inability to collect damages, will monetary damages alone give rise to irreparable harm. *See, e.g.*, 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2948.1; *Hughes*, 17 F.3d at 694; *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984).

Plaintiff asserts that it will suffer irreparable harm in the form of lost profits, loss of employees, cost of disposing of equipment purchased for the FAIR Contract, and loss of the opportunity to compete in a fair competitive bidding process. TRO Mot. at 16–17. These potential losses are primarily monetary. While these losses may be substantial, they are not irreparable. The only nonmonetary loss is the alleged lost opportunity to compete in a fair competitive bidding process. This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm. *Overstreet Elec. Co. v. United States*, 47 Fed.Cl. 728, 744 (2000); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 571 (2000). Mere allegations of an unfair competitive bidding process are not sufficient to demonstrate an irreparable injury, however; if they were, any bid protest would involve an irreparable injury. Here, plaintiff has strived to support its allegations

of a flawed procurement process. TRO Mot. at 6–15. As is discussed in more detail below in connection with the court's examination of plaintiff's likelihood of success on the merits, it is not clear that plaintiff was denied the opportunity to compete in a fair bidding process. Therefore plaintiff's potential harms remain primarily monetary. The court finds no extraordinary circumstances in this case such that plaintiff's monetary harms alone would give rise to an irreparable injury. Given these circumstances, plaintiff has demonstrated only slight evidence of an irreparable injury.

## C. Likelihood of Success on the Merits

■ To justify a TRO or preliminary injunction, a plaintiff must generally show a "reasonable probability" of success on the merits. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 2948.3; *A.L.K. Corp. v. Columbia Pictures Indus., Inc.,* 440 F.2d 761, 763 (3d Cir.1971); *King v. Saddleback Junior Coll. Dist.,* 425 F.2d 426, 428 n. 2 (9th Cir.1970), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971). The degree of likelihood of success considered by itself is not determinative. Rather, the likelihood of success and irreparable harm factors are weighed in relation to each other. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane §§ 2948.3, 2951; *Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d 506, 509 (7th Cir.1994); *Storck USA, L.P. v. Farley Candy Co.,* 14 F.3d 311, 314 (7th Cir.1994). When, as here, a plaintiff demonstrates only slight evidence of irreparable injury, the plaintiff must demonstrate a stronger likelihood of success on the merits.

### 1. Key Personnel

Plaintiff contends that CSC engaged in a prohibited "bait and switch" of its key personnel. TRO Mot. at 6–9. The parties are in general agreement, *see* TRO Mor. at 8; Defendant's Opposition to Motion for Temporary Restraining Order and/or Preliminary Injunction (Def.Opp.) at 14, that a "bait and switch" occurs when:

> (1) The awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2)

the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing the services.

*Unified Architecture & Eng'g, Inc. v. United States,* 46 Fed.Cl. 56, 64–65, *aff'd,* No. 00–5050, 251 F.3d 170, 2000 WL 1838629 (Fed. Cir. Dec.11, 2000).

The court agrees with plaintiff that key personnel are an important factor in the evaluation criteria of the Solicitation, with resumes of six individuals comprising 10 of the 100 points of the technical score and structured interviews with and oral presentations by key personnel comprising another 15 points. TRO Mot. at 7; AR at 160. The dispute now before the court focuses on the third prong of the test, whether it was foreseeable that one of CSC's four proposed area managers, Mr. Halva, "would not be available to perform the contract work." *Unified Architecture,* 46 Fed.Cl. at 64. After review of the parties' briefing, the Administrative Record (including a collection of documents focusing on the discovery of Mr. Halva's unavailability, AR at 217–260), and declarations from employees of both plaintiff and intervenor, it does not appear clear enough to the court that plaintiff will prevail in its "bait and switch" claim to justify injunctive relief.

The facts which appear at this juncture are as follows. The Solicitation was issued on June 29, 2000. AR at 1. After various amendments, discussions and proposal revisions, final proposal revisions were filed by OAO and CSC on February 12, 2001. AR at 498, 782. On March 9, 2001, while the proposals were under consideration, a CSC official received an e-mail from Mr. Halva stating that he would be unavailable to accept a position on the FAIR II Contract staff. Prehearing Memorandum of Intervenor Computer Sciences Corporation, Exh. 1, Declaration of Donald W. Fulford (Fulford Decl.) ¶ 10. Mr. Halva's e-mail is attached to Mr. Fulford's declaration. Mr. Fulford did not report his receipt of this message to his superiors at CSC because, based on a conversation with Mr. Halva and his friendship with Mr.

Halva, Mr. Fulford believed he would be able to persuade Mr. Halva to change his mind. *Id.* ¶ 11. Mr. Fulford also stated in his declaration that he understood "that this matter could not be brought to the attention of the government because final revised proposals had been submitted." *Id.* Mr. Fulford first reported his communication from Mr. Halva to EPA at a meeting held after contract award on March 21, 2001. AR at 241. An EPA official wrote to CSC on the same date that she was "deeply concerned" by the news and pointed out that the Solicitation "significantly restricts the substitution of key personnel during the first one hundred eighty (180) days of contract performance." *Id.* CSC attempted to secure replacement personnel satisfactory to EPA. AR 242–253. Although the record does not contain EPA's approval of the substitute, an approved substitution appears to have been effected. AR at 260.

Plaintiff's claim of a legal violation by CSC depends on CSC's having breached a duty to update its offer between the date of its final formal proposal submission and the date of award. It is not clear to the court that this duty exists. While much of the briefing deals with the various authorities on the elements of "bait and switch," the court must begin its legal analysis with the text of the Solicitation. The court notes that there is no language in the Solicitation which creates a duty to update the availability of key personnel between final offer and award. AR at 1–216. It would have been a simple enough matter for the agency to have added such a provision to the Solicitation in this case. The Solicitation provisions cited by plaintiff do not appear to the court to support the existence of a duty either. The court does not agree that a provision forbidding an offeror an opportunity to provide a repeat oral presentation by key personnel substituted after oral presentations, *see* AR at 139, must mean that substitutions are not permitted or that the oral presentation scores based on personnel who later become unavailable will be ignored. Transcript of Oral Argument on April 26, 2001 (Trans.) at 23–27. Likewise, the provisions of the Solicitation covering the form of resumes of key personnel and the form of the signed letters of intent required

to be filed with those resumes do not by their terms, or by implication, appear to require updating after final proposal revisions. *Id.* at 138.

The Solicitation also does not contain provisions closely analogous to those in the authorities plaintiff cites. For example, *Scientific Management Assocs., Inc.,* B–238913, 90–2 CPD ¶ 27, 1990 WL 278237 (Comp.Gen. July 12, 1999), cited by plaintiff at oral argument, involved a solicitation that permitted the agency to distinguish, in its evaluation of key personnel, between proposed personnel with whom the offeror had binding hiring commitments and proposed personnel with whom the offeror had only conditional hiring commitments. 1990 WL 278237 at *4. No such distinction is contemplated by the Solicitation here.

While the obligation to ascertain the continuing availability of key personnel at the time of submission of final proposal revisions has been recognized by several authorities, *see, e.g., CBIS Federal, Inc.,* B–245844, 71 Comp. Gen. 319, 323, 1992 WL 79112 (Mar. 27, 1992), the facts in this case do not coincide closely with the facts in such authorities. In *CBIS Federal,* GAO found it unreasonable for an offeror to expect that a proposed contract manager would be available eight months after signing a letter of intent where the offeror had not been in contact with the individual at all during the period. *Id.* at 324. In this case, Mr. Halva, the proposed area manager, contacted Mr. Fulford by e-mail on December 27, 2000, reporting a change in employment and stating, with respect to the FAIR II contract, "DO NOT COUNT ME OUT, please." Exhibit 2 to Fulford. Decl. (emphasis in original).

Mr. Fulford appears to have mistaken the law with respect to the propriety of communicating Mr. Halva's possible unavailability to the EPA, and the failure to communicate appears to have concerned defendant. *See* AR at 241. Nevertheless, Mr. Fulford's actions, however ill-advised, do not seem sufficiently likely to be able to support a finding of a breach of a legal duty to justify a TRO or preliminary injunction in the absence of significant evidence of an irreparable harm.

### 2. Meaningful Discussions

■ Plaintiff argues that defendant failed to engage in meaningful discussions because it did not consider OAO's responses to questions during the discussion phase of the procurement. TRO Mot. at 10. The Federal Acquisition Regulations (FAR) authorizes discussions between the government and offerors. FAR § 15.306(d) ("When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions."). These discussions must be meaningful. *Dynacs Eng'g Co. v. United States*, 48 Fed.Cl. 124, 131 (2000). Discussions are meaningful if they include sufficient information to advise an offeror of the weaknesses in its proposal and enable it to address those weaknesses. *Id.*

■ Plaintiff correctly asserts that the meaningful discussion requirement implies that the agency will consider the offeror's responses to the agency's questions and clarification requests. TRO Mot. at 10–12. It is not at all clear, however, that defendant failed to consider plaintiff's responses. In its Initial Technical Proposal Evaluation for OAO, defendant included three weaknesses in plaintiff's Adequacy of Technical Proposal, a subcategory of Written Technical Proposal: 1)[ ]; 2)[ ]; and 3)[ ]. AR at 268. Plaintiff submitted information in response to these specified weaknesses. AR at 719–20, 723–25. In its Revised Technical Evaluation Report for OAO, defendant categorized each of plaintiff's responses as "adequate." AR at 431. After considering the responses and finding them adequate, the Technical Evaluation Panel concluded that plaintiff's score of [ ] should remain unchanged. AR at 432. The text describing the three weaknesses, however, reappears in defendant's Source Selection Decision Memorandum. AR at 476. The Revised Technical Evaluation Report makes clear that defendant did in fact consider these responses when re-scoring plaintiff's bid, and that the description of the three weaknesses in the Source Selection Decision Memorandum was in error.

■ According to plaintiff, the fact that its technical evaluation score did not change after submitting responses demonstrates a systematic failure by defendant to consider its responses. Trans. at 80. The subcategory of the Technical Evaluation at play here, Adequacy of Technical Proposal, involves a base scoring scale of five points, which are then scaled up to a maximum of 20 points. AR at 430. With a scale of only five points, a difference of one point is substantial. Plaintiff received a score of [ ] points out of five in both its Initial Technical Proposal Evaluation and Revised Evaluation Report. *Id.* Plaintiff contends that its responses should have raised its score in the Revised Evaluation. Trans. at 31–34. It is not clear to the court, however, that resolution of three technical weaknesses by "adequate" responses would necessarily have been sufficient to cause a one point change the evaluation scale. The inclusion of text in the Source Selection Memorandum describing weaknesses previously corrected is an obvious error in the documentation of the procurement. Given the inclusion in the Source Selection Memorandum of the scoring from the Revised Evaluation Report, which reflected the agency's consideration of plaintiff's correction of these weaknesses, the court does not find this error so clearly prejudicial as to justify injunctive relief.

Since plaintiff has demonstrated only minimal evidence of an irreparable harm, it must demonstrate a greater likelihood of success on the merits. In these circumstances, plaintiff's likelihood of showing that defendant failed to conduct meaningful discussion is not substantial enough to justify a TRO or preliminary injunction.

### 3. Rational Basis for Evaluation

To succeed on the merits, plaintiff must ultimately demonstrate that defendant's actions were without a rational basis or in violation of applicable procurement law. *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997). According to plaintiff, defendant's evaluation of OAO's proposal lacked a rational basis. TRO Mot. at 12. In particular, plaintiff alleges that evaluations of its start-up plan, ability to attract and retain staff, oral presentations, use of small disadvantaged businesses, overall technical proposal, key personnel, and past performance

lacked a rational basis. *Id.* at 13–15. Plaintiff bases these allegations on various statements from defendant at the debriefing. *Id.* However, examination of the evaluation factors in the Solicitation, together with plaintiff's Initial and Revised Technical Evaluations, reveals criteria and explanations for scoring in each category.

Since plaintiff has demonstrated only minimal evidence of an irreparable harm, it must demonstrate a greater likelihood of success on the merits. In these circumstances, plaintiff's likelihood of showing that defendant's evaluation of its proposal lacked a rational basis is not substantial enough to justify a TRO or preliminary injunction.

### D. Balance of Harms

The court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant. Generally, if the balance tips in favor of defendant, a TRO or preliminary injunction is not appropriate. 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane §§ 2948.2, 2951. Plaintiff alleges a number of financial harms that it would suffer with preliminary relief. TRO Mot. at 18–19. The financial harms intervenor would suffer with preliminary relief, however, should be roughly equivalent to plaintiff's financial harms. The EPA has the additional, admittedly moderate, harm of continuing with the services provided by the FAIR contract, rather than the superior services of the FAIR II Contract. In weighing plaintiff's harm against defendant's and intervenor's, the scale appears fairly even, if not slightly tipped in defendant's favor. Therefore plaintiff has not demonstrated that the balance of harms favors OAO.

### E. Public Interest

Finally, the court must consider whether a TRO or preliminary injunction in this case will further or injure the public interest. According to plaintiff, granting preliminary relief would benefit the public interest because it would both protect the integrity of the federal procurement process and allow the EPA to continue receiving services from OAO under the less expensive FAIR Contract. TRO Mot. at 17–18. Defendant argues that preliminary relief is not in the public interest because it would deprive the EPA of the features of the FAIR II Contract, including better security. Def. Opp. at 17. In terms of the public interest, any possible cost benefit of continuing under the FAIR Contract under a TRO would not, in the court's view, outweigh the benefit to the EPA of the added features of the FAIR II. The remaining potential benefit to the public interest is protecting the integrity of the procurement process. While this benefit is not insignificant, plaintiff's evidence of a flawed procurement process is not so clear as to require the vindication of that interest at the expense of the agency's ability to provide for its mission needs.

### III. Procedural Note

During oral argument, counsel for plaintiff addressed the question why, if plaintiff knew at least by the time of its debriefing on April 2, 2001 of the matters that caused it to bring this claim and seek temporary relief, it had not done so before the afternoon of April 24, 2001. The question has some additional interest because the date and time when the transition between plaintiff and CSC is scheduled to take place is midnight on Friday, April 27, 2001, only three days after the date of plaintiff's filing in this court and the day after an expedited hearing was held on expedited briefing. Plaintiff's counsel stated at oral argument that plaintiff was "headed to this court" when another offeror filed a protest with the General Accounting Office that resulted in a stay of contract performance. Trans. at 40. Counsel then stated that plaintiff "would not have had a basis to seek injunctive relief" if OAO had come to court then or until the stay was overridden by EPA to allow it to proceed with the FAIR II Contract. *Id.* at 41. The court is not aware that its jurisdiction would be ousted by a protest by a different offeror in the procurement in another forum. Moreover, plaintiff would have given both itself and the other parties a fuller opportunity to assemble records and examine the issues. To the extent plaintiff now complains about any "serious, serious issue," *id.* at 40, discovered only

after the delivery of the Administrative Record on April 25, 2001, its difficulty is to some degree of its own making.[2]

## IV. Conclusion

For the foregoing reasons, the court DENIES plaintiff's motion for a temporary restraining order or preliminary injunction.

IT IS SO ORDERED.

---

**2.** In the Source Selection Memorandum, defendant evaluated both CSC's and OAO's proposed costs at higher amounts, such that OAO's evaluated cost was [ ] than CSC's evaluated cost. AR at 480. At oral argument and in its supplemental brief, plaintiff argued that defendant failed to disclose these evaluated costs at debriefing, thus depriving OAO of procedural due process. Trans. at 38–41; Plaintiff's Supplemental Memorandum in Support of Motion for a Temporary Restraining Order and/or Preliminary Injunction (Pl.Br.) at 7–9. The parties agreed at oral argument to disclose the details of defendant's cost evaluations to OAO, thus providing plaintiff with a possible additional basis of protest. As presently advised, the court finds this delay in disclosure insufficient to justify a TRO or preliminary injunction.